UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SHAMORA LEMON, individually,
as personal representative for the
ESTATE OF LYRIC JOHNSON, and as
parent and guardian of HARMONY
LOFTON, a minor,

    Plaintiff,

  v.                                     Case No. 19-CV-1384

AURORA HEALTH CARE NORTH INC., et al.,

    Defendants.

## DECISION AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS AMENDED COMPLAINT

This lawsuit arises out of the tragic death of plaintiff Shamora Lemon's two-year-old daughter, Lyric Johnson. Lemon sues the doctors and hospital that provided medical care to Lyric under various state and federal laws. Lemon pleads that this Court has subject-matter jurisdiction over her alleged federal claims (Count IX – violation of 42 U.S.C. § 1395dd, *et. seq.*, the Emergency Medical Treatment and Active Labor Act ("EMTALA"); Count X – violation of Title VI of the Civil Rights Act of 1964; and Count XI – violation of 42 U.S.C. 18116, § 1557 of the Patient Protection and Affordable Care Act ("ACA")) and supplemental jurisdiction over her state law claims pursuant to 28 U.S.C. § 1367. (Am. Compl. ¶ 68, Docket # 47.)

The defendants previously moved to dismiss Lemon's complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Judge Adelman, who was previously assigned this case, granted the motion, but granted Lemon leave to file an amended pleading addressing the deficiencies

identified in the order. (Docket # 46.) Lemon filed an amended complaint (Docket # 47) and the defendants now renew their motions to dismiss under Rules 12(b)(1) and 12(b)(6) (Docket # 51, Docket # 54, and Docket # 58).[1]

For the reasons below, the motions to dismiss are granted and the amended complaint is dismissed.

## BACKGROUND

On March 5, 2018, two-year-old Lyric, an African American girl, was taken to the emergency department at defendant Aurora Health Care North, Inc. by her mother, Shamora Lemon, who is also African American. (Am. Compl. ¶¶ 1–2, 23.) Lyric was seen by defendant, Dr. Jeffrey D. Schroeder, who diagnosed her with a viral upper respiratory infection. (*Id.* ¶ 23.) At approximately 7:56 a.m. on March 20, 2018, Lyric returned to the emergency department and was triaged by staff who determined that Lyric's acuity level for emergency care was urgent. (*Id.* ¶ 24.) Lyric was seen by defendant, Dr. Ryan T. Murphy. (*Id.*) At approximately 8:01 a.m., Lyric was in pain, was exhibiting pain associated behaviors, and had a sad expression. (*Id.* ¶ 25.) Lyric's temperature was 103.9 degrees Fahrenheit; she had an elevated, abnormal heartrate of 159 beats per minute; and she had an elevated, abnormal respiratory rate of 38 breaths per minute. (*Id.* ¶ 26.) Lemon alleges that Dr. Murphy either knew or should have known about Lyric's previous diagnosis of an acute viral upper respiratory infection. (*Id.* ¶ 27.)

---

[1] Defendant Injured Patients and Families Compensation Fund moved to dismiss Lemon's original complaint (Docket # 42); however, the Court's previous Order did not specifically address the Fund's motion (Docket # 46). Because the amended complaint supersedes the previous complaint and becomes the operative pleading in the case, *Johnson v. Dossey*, 515 F.3d 778, 780 (7th Cir. 2008) ("When an amended complaint is filed, the prior pleading is withdrawn and the amended pleading is controlling."), the filing of an amended complaint renders moot any pending motion to dismiss, *see Aqua Fin., Inc. v. Harvest King, Inc.*, No. 07-C-015-C, 2007 WL 5404939, at *1 (W.D. Wis. Mar. 12, 2007) (collecting cases). Thus, Docket # 42 is denied as moot. The Fund subsequently renewed its motion to dismiss Lemon's amended complaint. (Docket # 58.)

Dr. Murphy examined Lyric, however, relying on an axillary temperature measurement, he incorrectly found Lyric's temperature to be 102.1 degrees Fahrenheit. (*Id.* ¶ 28.) Furthermore, Dr. Murphy allegedly incorrectly charted Lyric's heart and lung examinations as normal despite her tachycardia and tachypnea. (*Id.*) Dr. Murphy noted Lyric's overall exam was "benign." (*Id.*) At approximately 8:48 a.m., Lyric was given a large dosage of ibuprofen. (*Id.* ¶ 29.) At approximately 9:37 a.m., a nasopharyngeal swab confirmed that Lyric had an influenza B infection. (*Id.* ¶ 30.)

By approximately 10:00 a.m., Lyric's fever still hovered around 103 degrees Fahrenheit and her heart and respiratory rates remained elevated and abnormal. (*Id.* ¶ 31.) Lyric was discharged without any further screening, treatment, or care. (*Id.* ¶ 32.) Lemon called the emergency department twice on March 21, 2018 regarding Lyric's worsening condition. (*Id.* ¶ 35.) Lemon alleges that she spoke to Dr. Murphy regarding Lyric's difficulty breathing, and even placed the telephone receiver next to Lyric's mouth so that Dr. Murphy could listen to her breathe. (*Id.*) Lemon alleges that Dr. Murphy stated that there was nothing more or different that he could do to treat Lyric and discouraged Lemon from bringing Lyric back to the emergency department. (*Id.*)

Around 8:45 a.m. the following morning, on March 22, 2018, Lyric presented to the emergency department in critical condition. (*Id.* ¶ 36.) Staff performed a respiratory evaluation of Lyric and noted grunting, tachypnea, shallow breaths, and blood in Lyric's mouth. (*Id.*) Staff noted that Lyric's capillary refill time was longer than normal at more than three seconds. (*Id.*) Lemon alleges that despite these findings, Lyric waited in the emergency department waiting room from 8:45 a.m. until 9:37 a.m., receiving no care. (*Id.*)

At approximately 9:37 a.m., Lyric was again evaluated by staff, who noted that she had an elevated and abnormal heartrate and an elevated and critically dangerous respiratory rate. (*Id.* ¶ 37.) Lyric was examined by Dr. Schroeder at approximately 9:48 a.m., who determined that Lyric's acuity level was "less urgent." (*Id.* ¶ 38.) Lemon alleges that for the next approximately twenty minutes, Lyric was administered various medications that increase the heartrate and Lyric's heartrate increased to 204 beats per minute. (*Id.* ¶ 39.) Lemon alleges that antibiotics and antiviral medication were ordered for Lyric, but were never administered. (*Id.* ¶ 40.)

A chest x-ray around 10:00 a.m. showed dense consolidation in Lyric's left mid and lower lung. (*Id.* ¶ 42.) Approximately twenty minutes later, staff made three unsuccessful attempts to insert an IV into Lyric's left wrist. (*Id.* ¶ 43.) By 11:00 a.m., no laboratory studies had been obtained and no antibiotics had been administered to Lyric. (*Id.* ¶ 44.) At approximately 11:17 a.m., Dr. Schroeder unsuccessfully attempted to intubate Lyric, passing the tube into her esophagus and stomach, causing her to vomit and aspirate. (*Id.* ¶ 45.) About ten minutes later, Dr. Schroeder removed the first tube and attempted to insert a second tube, also unsuccessfully. (*Id.* ¶ 46.) Lemon alleges that Dr. Schroeder falsely documented that he successfully inserted a 5.0 mm tube on his first attempt without complication. (*Id.* ¶ 47.)

Following the unsuccessful attempts to intubate Lyric, staff performed bag valve mask ventilation to help Lyric breathe. (*Id.* ¶ 48.) Lyric again vomited blood and fluids and aspirated. (*Id.* ¶ 50.) Following Dr. Schroeder's second attempt to intubate Lyric, her heartrate dropped from 200 beats per minute to 40 beats per minute. (*Id.* ¶ 51.) An anesthesiologist called a code blue. (*Id.*) Lyric was given chest compressions and electrical

defibrillation. (*Id.* ¶ 52.) The anesthesiologist removed the second tube placed by Dr. Schroeder and passed a third 5.0 mm endotracheal tube into Lyric's trachea to help her breathe. (*Id.*) Lyric died at approximately 12:12 p.m. (*Id.* ¶ 53.)

Shortly after Lyric's death, Dr. Schroeder and/or the hospital staff documented that Lyric died due to trauma. (*Id.* ¶ 54.) Lemon alleges that a "trauma death" signifies that the death was caused due to physical injuries of sudden onset by an outside force or event, such as child abuse or neglect. (*Id.* ¶ 55.) The Manitowoc County Coroner's Office was notified of Lyric's death; however, Lemon alleges that the circumstances of Lyric's death did not meet the statutory requirements necessitating reporting. (*Id.* ¶¶ 56–57.) That same day, the Coroner contacted the Two Rivers Police Department to initiate a police investigation surrounding the circumstances of Lyric's death. (*Id.* ¶ 58.) Police officers were dispatched to the emergency department to conduct an investigation. (*Id.*)

Police officers conducted numerous interviews of Lyric's healthcare providers and family members. (*Id.* ¶ 59.) Lemon's house was searched. (*Id.* ¶ 59.) Blood cultures obtained on the day Lyric died showed that Lyric had a streptococcus pneumoniae bacterial infection. (*Id.* ¶ 60.) Autopsy revealed that Lyric's lung infection was present for several days, including on March 20, 2018, and progressed into a necrotizing, gangrenous pneumonia as it went undiagnosed and untreated. (*Id.* ¶ 66.)

## STANDARD OF REVIEW

Lemon brings thirteen causes of action in her amended complaint—three of which are federal statutory claims. (Docket # 47.) Lemon asserts federal question jurisdiction under 28 U.S.C. § 1331 for the federal claims and supplemental jurisdiction under 28 U.S.C. § 1367 for the state law claims. All defendants move to dismiss Lemon's complaint pursuant

to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). They argue that because Lemon fails to state a claim under federal law, the court lacks subject matter jurisdiction to hear Lemon's case. (Docket # 55 at 4–5; Docket # 52 at 2–3.)

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of the complaint on the basis that the plaintiff has failed to state a claim upon which relief can be granted. A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has interpreted this language to require that the plaintiff plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Ashcroft v. Iqbal*, the Supreme Court elaborated further on the pleadings standard, explaining that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," though this "standard is not akin to a 'probability requirement.'" 556 U.S. 662, 678 (2009). The allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citation omitted).

When determining the sufficiency of a complaint, the court should engage in a two-part analysis. *See McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). First, the court must "accept the well-pleaded facts in the complaint as true" while separating out "legal conclusions and conclusory allegations merely reciting the elements of the claim." *Id.* (citing *Iqbal*, 556 U.S. at 680). Next, "[a]fter excising the allegations not entitled to the presumption [of truth], [the court must] determine whether the remaining factual allegations 'plausibly suggest an entitlement to relief.'" *Id.* (citing *Iqbal*, 556 U.S. at 681). As explained in *Iqbal*, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the reviewing court to draw on its judicial experience and common sense." 556 U.S. at 679. All factual allegations and any reasonable inferences must be construed in the light most favorable to the nonmoving party. *Price v. Bd. of Educ. of City of Chicago*, 755 F.3d 605, 607 (7th Cir. 2014).

## ANALYSIS

As stated above, Lemon alleges three federal claims (Count IX – violation of EMTALA, Count X – violation of Title VI, and Count XI – violation of the ACA). The three federal claims form the basis of this Court's jurisdiction over the state law claims. The defendants argue that the amended complaint fails to state a claim under any of the three federal statutes invoked by Lemon. Because federal jurisdiction hinges on Lemon's federal claims, I will address them first.

    1.    *Violation of EMTALA*

Lemon alleges that the hospital violated EMTALA when Dr. Murphy and hospital staff disregarded Lyric's symptoms and inappropriately screened her. EMTALA prohibits hospitals from inappropriately transferring or refusing to provide medical care to persons with emergency medical conditions. 42 U.S.C. §§ 1395dd(a)–(c) (requiring hospitals to provide medical screening and stabilizing treatment for all patients with emergency medical conditions). The purpose of the statute is to prevent "patient dumping," the practice of refusing to provide emergency medical treatment to patients who are unable to pay, or transferring them before their emergency conditions are stabilized. *See Beller v. Health and Hosp. Corp. of Marion County, Indiana*, 703 F.3d 388, 390 (7th Cir. 2012) (internal citations omitted). EMTALA provides a private right of action for individuals who sustain personal harm as result of a hospital's violation of the statute. *See* 42 U.S.C. § 1395dd(d)(2)(A).

EMTALA imposes two basic obligations on hospitals: First, when an individual seeks treatment at a hospital emergency room, "the hospital must provide for an appropriate medical screening examination to determine whether or not an emergency medical condition exists" and second, if the screening examination reveals the presence of an emergency medical condition, the hospital must "stabilize" the medical condition before transferring or discharging the patient. 42 U.S.C. § 1399dd(a)–(b). As Judge Adelman stated in the previous decision, under EMTALA, an "appropriate medical screening examination" is not judged by its proficiency in accurately diagnosing the patient's illness, but rather by whether it was performed equitably in comparison to other patients with similar symptoms. *Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998). EMTALA is not a malpractice statute; that the treatment provided was ineffective does not violate EMTALA so long as the patient was screened and stabilized. *Lim v. Beloit Health Sys.*, No. 12-C-0168, 2012 WL 12929553, at *4 (E.D. Wis. Oct. 31, 2012) (collecting cases).

In dismissing Lemon's original complaint, Judge Adelman found that while Lemon alleged that Dr. Murphy did a poor job screening Lyric and failed to recognize the severity of her illness, the complaint failed to state a claim under EMTALA because it did not allege that Dr. Murphy provided Lyric with a medical screening that was different or less than what the hospital would have provided any other patient presenting with such symptoms. (Docket # 46 at 7.) Judge Adelman further found that because Dr. Murphy did not determine that Lyric had an emergency condition, the "failure to stabilize" component of EMTALA was not implicated. (*Id.*)

In an attempt to address the deficiencies Judge Adelman identified, Lemon adds the following allegations to her amended complaint:

- Dr. Murphy and hospital staff "provided screening that was inconsistent and less than what the Hospital would have provided to other pediatric patients presenting with the same apparent symptoms, in effect dumping LYRIC from the ED without further intervening on her behalf." (Am. Compl. ¶ 142.)

- "LYRIC did not receive the same forms of emergency screening that other similarly situated pediatric patients would have received, specifically including, but not limited to a chest xray, laboratory studies, initiation of sepsis screening protocols, and the administration of antiviral and antibiotic medications." (Am. Compl. ¶ 143.)

- "SHAMORA'S lack of private health insurance was a reason why she and LYRIC were dumped from the ED without LYRIC receiving an appropriate screening examination pursuant to EMTALA, and without LYRIC receiving further treatment and care or stabilization of her emergency medical condition prior to her discharge." (Am. Compl. ¶ 144.)

- "LYRIC'S inappropriate screening examination on March 20, 2018 had a disparate impact on LYRIC such that LYRIC was not treated as other similarly situated pediatric patients would have been treated had they presented to the HOSPITAL on or around March 20, 2018 with the conditions and symptoms LYRIC presented with that morning." (Am. Compl. ¶ 145.)

Lemon argues that the amended complaint "very specifically alleges" that had other, similarly situated pediatric patients with the same apparent symptoms as Lyric presented to Dr. Murphy and the hospital staff on March 20, 2018, they would have been screened differently than Lyric. (Docket # 61 at 9–10.) Lemon argues that the amended complaint "alleges a plethora of facts that, if taken as true, establish the Hospital, through the acts of its agents . . . treated Lyric differently than other similarly situated patients with the same apparent symptoms." (*Id.* at 10.) The defendants argue that the "plethora of facts" alleged in the amended complaint are nothing more than bald conclusory statements, bereft of factual enhancement. (Docket # 62 at 5.)

As the *Iqbal* Court explained, while Rule 8 does not require "detailed factual allegations," it "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." 556 U.S. at 678. A complaint that merely offers conclusions or formulaic

recitations of a cause of action's elements is insufficient, as is a complaint offering "naked assertions devoid of further factual enhancement." *Id.* (quoting *Twombly*, 550 U.S. at 557). To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, that states a plausible claim to relief. *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While the plausibility standard is not akin to a probability requirement, "it asks for more than a sheer possibility that a defendant has acted unlawfully . . . .Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Here, rather than address the deficiencies that Judge Adelman identified in the original complaint, Lemon simply added the language from Judge Adelman's order to the allegations in the amended complaint. This is insufficient to correct the deficiency. What Lemon describes as a "plethora of facts" are nothing more than legal conclusions. Again, *Iqbal* requires a complaint to plead facts that state a plausible claim for relief. A plausible claim is not a sheer possibility that the defendant acted unlawfully. Yet, Lemon's complaint speaks in terms of sheer possibility—"Lyric's inappropriate screening examination on March 20, 2018 had a disparate impact on Lyric such that Lyric was not treated as other similarly situated pediatric patients *would have been treated had they presented to the Hospital* on or around March 20, 2018 with the conditions and symptoms Lyric presented with that morning." (Am. Compl. ¶ 145) (emphasis added). In other words, the amended complaint alleges that if some hypothetical similarly situated person would have presented to the emergency department, staff would have treated that person differently. There are no factual

allegations that hospital staff *were* treating similarly situated patients differently. Lemon's amended complaint still fails to sufficiently plead a claim under EMTALA. Thus, Lemon's EMTALA claim is dismissed.

    2.    *Violation of Title VI and the ACA*

Lemon also alleges that the hospital refused to treat Lyric because of her lack of private health insurance (she was insured by Medicaid) and because of her race. (Am. Compl. ¶¶ 1, 150.) She alleges that because of Lemon and Lyric's race, the hospital mischaracterized Lyric's death as due to trauma and improperly notified the Coroner's office. (*Id.* ¶¶ 151–60, 165–66.) Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of race by programs and activities receiving federal funds, 42 U.S.C. § 2000d, and § 1557 of the ACA, 42 U.S.C. § 18116, prohibits discrimination of the sorts prohibited under Title VI by health programs receiving federal funds. To state a claim for damages under these statutes, a plaintiff must plead facts that support a finding of intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001); *see also Khan v. Midwestern Univ.*, 147 F. Supp. 3d 718, 720 (N.D. Ill. 2015) ("To state a claim under Title VI, plaintiffs must allege facts satisfying two elements: (1) that they have been intentionally discriminated against on the grounds of race; and (2) that defendants are recipients of federal financial assistance."). In finding that Lemon's original complaint failed to state a claim under either statute, Judge Adelman stated that although "the complaint alleges that Lyric received woefully inadequate care, nothing in the complaint supports the inference that such deficiencies were caused by racial discrimination as opposed to sheer negligence." (Docket # 46 at 8.) Regarding the complaint's allegation that the hospital notified the Coroner's office, Judge Adelman found that "on the face of it, it does not seem

extraordinary that a hospital should notify a coroner of a patient's sudden and at that point unexplained death." (*Id.*)

Lemon points to paragraphs 142–161 of her amended complaint as allegedly providing sufficient facts to support the inference that the defendants intentionally discriminated against Lyric because of her race. (Docket # 61 at 11–12.) The amended complaint recounts the factual allegations that Judge Adelman previously stated allege negligence, but adds that "[o]n information and belief," Lyric's substandard medical care was "intentional and premised on the basis of Shamora's and Lyric's lack of private insurance coverage and race." (Am. Compl. ¶ 150–53.) Beyond Lemon's conclusory assertions, however, the amended complaint alleges no facts that plausibly suggest Lyric's treatment was motivated by intentional racial discrimination. Again, *Iqbal* instructs that allegations of fact are entitled to an assumption of truth—not conclusory allegations. 556 U.S. at 680. Although the distinction between "fact" and "conclusion" is not always crystal clear, one commentator explained it as follows:

> A conclusory allegation is one that asserts "the final and ultimate conclusion which the court is to make in deciding the case for him," that is, one that alleges an element of a claim. Such an allegation is not itself assumed to be true, but must be supported by the pleader going a "step further back" and alleging the basis from which this conclusion follows.

Edward A. Hartnett, *Taming Twombly, Even After Iqbal*, 158 U. Pa. L. Rev. 473, 491 (2010) (internal citations omitted). The amended complaint alleges intentional racial discrimination, specifically that because of her race, Lyric was improperly treated and triaged, that her death was mischaracterized as due to trauma, and that the hospital contacted the Coroner's office. (Am. Compl. ¶¶ 150–56, 165–66.) These are not allegations of fact; they are conclusions. By way of illustration, in *Jackson v. N. Illinois Univ. Coll. of Law*,

No. 10 C 01994, 2010 WL 4928880, at *2 (N.D. Ill. Nov. 30, 2010), the plaintiff, an African-American woman, alleged Title VI race discrimination based on the defendant's refusal to admit her as a student in its JD program. Plaintiff's race discrimination was based solely on her allegation that: (1) she was a black woman; and (2) defendant had a low percentage of black women and black students in its JD program. *Id.* The court explained that Title VI prohibits only intentional discrimination, and that the "type of conclusory allegations" plaintiff sets forth did "not support such an inference." *Id.*

Similarly, Lemon's amended complaint fails to allege, for example, that the hospital treated a similarly situated patient of a different race differently, whether that involves Lyric's medical treatment or the actions taken after her death (i.e., contacting the Coroner's office). Instead, Lemon alleges that similarly situated patients (presumably not African American) *would have been* treated differently by the Hospital. This is not a difference of semantics. As stated above, a plausible claim is not a sheer possibility that the defendant acted unlawfully. To sufficiently state a claim of intentional discrimination based on race, Lemon must assert facts, not conclusions, tying the defendants' actions to the plaintiff's race. The amended complaint, however, does nothing more than make a conclusory assertion that the actions the hospital staff took were based on Lyric and Lemon's race. For these reasons, Lemon's amended complaint fails to state a claim under Title VI and the ACA.

### 3. Leave to Amend

The Seventh Circuit has stated that a "plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed" and that when "a district court denies a

plaintiff such an opportunity, its decision will be reviewed rigorously on appeal." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519 (7th Cir. 2015). The amended complaint currently before me is already Lemon's attempt to correct the deficiencies found by the Court. The amended complaint fails, however, to cure the deficiencies as to Lemon's federal claims. The *Runnion* court states that when "it is clear that the defect cannot be corrected so that amendment is futile," there is no harm denying leave to amend and entering final judgment. *Id.* at 520. This is such a case where further amendment would be futile. Thus, I will not grant Lemon leave to further amend her complaint.

    4.    *State Law Claims*

Without the federal claims, all that remain are Lemon's state law claims. I will follow the general rule by relinquishing jurisdiction over the supplemental state law claims. *See Redwood v. Dobson*, 476 F.3d 462, 467 (7th Cir. 2007) ("A court that resolves all federal claims before trial normally should dismiss supplemental claims without prejudice."). Thus, Lemon's state law claims are dismissed without prejudice.

## CONCLUSION

Lyric's death is indisputably tragic, and nothing in this decision is intended to minimize the tragedy of the loss of two-year-old Lyric. However, Lemon's amended complaint insufficiently pleads allegations of violations under EMTALA, Title VI, and the ACA and must be dismissed. I decline to exercise supplemental jurisdiction over Lemon's state law claims.

**ORDER**

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motions to dismiss (Docket # 51) and (Docket # 54) are **GRANTED**. Claims Nine, Ten, and Eleven of the amended complaint are **DISMISSED WITH PREJUDICE**. The remaining state law claims are **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that the clerk of court shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 22nd day of February, 2021.

BY THE COURT

*[signature]*

_____
NANCY JOSEPH
United States Magistrate Judge